Exhibit B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                                      Chapter 11(Involuntary)

GUERRINI FAMILY LIMITED PARTNERSHIP         Case No. 8:06-bk-05383-MGW

    Debtor.

_____/

**<u>DECLARATION OF DAVID E. HAMMER IN SUPPORT OF EMERGENCY
MOTION TO VACATE ORDER GRANTING COMPEL MOTION</u>**

1.  I am over the age of twenty-one and I have personal knowledge of the facts contained herein.  I am a member of the Florida Bar, bar number 23173, as well as a member of the Bar of the Middle District of Florida.

2.  On November 28, 2006, I had attempted to take the deposition of Mary Katherine Haire.  It was very apparent that Scott Lilly and John Anthony, of GrayRobinson P.A., were making every effort to thwart that deposition.

3.  Sometime that afternoon, Mr. Anthony hand delivered a copy of the Motion to Compel Compliance with Bidding Procedures Order ("Motion").  I specifically told Mr. Anthony that I would not be distracted by the Motion until the deposition was over, and placed it face down on the table.

4.  On November 28, 2006, at approximately 3:15 PM, Mr. Anthony hand delivered to me a copy of a Notice of Hearing, which stated that the Motion would be heard at 4:00 PM that day.  I suspended the deposition of Ms. Haire, and left for the courthouse.  After briefly reading the Motion, I had no idea why the Motion had been filed.

5.  Prior to arriving at the courthouse, I called Terri Steffen, to inquire about the factual basis for the Motion.  Ms. Steffen told me that she spoke to Amanda Matthews from GrayRobinson P.A.

by telephone that morning, and that Ms. Matthews sought to schedule a building inspection of the property on November 30, 2006. Ms. Steffen told me that she told Ms. Matthews that there were already tours of the property scheduled for that day, and asked Ms. Matthews if one of three days the following week would be acceptable. Ms. Steffen told me further that Ms. Matthews agreed to call Ms. Steffen back, but never did.

6. At the hearing on November 28, 2006 at 4:00 PM, I explained to Judge Williamson that if the relief requested in the Motion were granted, which included that the Court direct the United States Marshal's Service ("Marshals") to facilitate access to the Residence, that the presence of the Marshals may scare or intimidate a prospective bidder.

7. Judge Williamson granted the Motion, but ruled that the Marshals would only be used if access were denied for any reason.

8. On November 30, 2006, I arrived at the residence located at 16229 Villarreal de Avila, Tampa, Florida, ("Residence") at approximately 8:25 AM. I was present for the purpose of insuring that building inspectors were granted access to the Residence.

9. At approximately 8:50 AM, I was alerted to the presence of several cars outside the gate of the Residence. At least ten individuals were waiting. Not one had called for the gate to be opened from the call box. I approached the gate only to learn that there were Marshal cars blocking the driveway, so that no other vehicle could get in before the Marshals. I opened the gate, intent on allowing in various building inspectors pursuant to an order entered by this Court. Rather, the Marshals instructed me to move my body from in front of their vehicles, so that they could drive into the interior driveway.

10. After the Marshals drove in, they served me with this Court's Order Directing United States Marshal's Service to Facilitate Entry into Premises (Doc. 153) ("Order"). I explained to the

Marshals that, according to that very Order, their presence was only authorized if they were notified that the inspectors were denied access. Nonetheless, they proceeded to the front entry of the Residence. During that time, the Marshals started asking me questions such as who was present in the Residence.

11. I opened the front door to the Residence, to let myself and the building inspectors in. The Marshals entered at that time.

12. I paged Paul Bilzerian to the foyer of the Residence to inform him of the presence of the inspectors and the Marshals.

13. Mr. Bilzerian arrived promptly. He inquired as to the Marshals' authority to be on the premises. In response, he was given a copy of the Order. Given that the Order only authorizes the Marshals' presence "[i]n the event the Debtor notifies the U.S. Marshal that the Debtor's representative and any potential purchaser, and their designated agents, are denied access to the Property on November 30, 2006 at 9:00 a.m.," Mr. Bilzerian inquired as to whether the Debtor notified the Marshal that anyone was denied access. The Marshal refused to answer.

14. Mr. Bilzerian suggested we telephone Judge Williamson, so that he could resolve whether the Marshals were authorized on the premises. Unfortunately, Judge Williamson was in a hearing in Fort Myers, Florida, where he was not readily accessible. Mr. Bilzerian then suggested the Marshals contact those Marshals present at the Fort Myers, Florida courthouse, to get Judge Williamson's attention.

15. Approximately fifteen minutes later, one of the Marshals called the other marshals outside to confer. Then, all the Marshals began walking rapidly to their cars to exit. Mr. Bilzerian and I both asked the Marshals why they were leaving. They refused to answer.

16. Later that morning, Patricia Mitchell, from Apollo Environmental, Inc., arrived to

perform an air quality inspection.  Mr. Bilzerian and I guided her into the home, and told her she was free to inspect as she pleases.  In the early afternoon, Ms. Mitchell approached me and informed me that she came "on no notice," and could not stay all day, because "she could not cancel all her other appointments."  I gave her the telephone number at the Residence, and instructed her to coordinate her return with Terri Steffen.

17.  I remained at the Residence until approximately 4:45 PM.  At no time between my arrival at 8:25 AM and my departure at 4:45 PM did Joseph Nolan or any representative of the Stalking Horse arrive on the property.  When I left, Stephanie Biernacki was waiting for Larry Mobley, an alleged bidder.  None of the attorneys at GrayRobinson, P.A. have given me any information regarding Mr. Mobley's financial qualifications to bid on the property.

18.  As I learned from Mr. Bilzerian, who remained at the Residence the entire day, neither Joseph Nolan nor any representative of the Stalking Horse arrived on the property for the remainder of the day.

I, David Eric Hammer, declare under penalty of perjury that the foregoing is true and correct. Executed on this 1st day of December, 2006, in Tampa, Florida.

David E. Hammer