Exhibit C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                                    Chapter 11(Involuntary)

GUERRINI FAMILY LIMITED PARTNERSHIP          Case No. 8:06-bk-05383-MGW

        Debtor.
_____/

### DECLARATION OF PAUL A. BILZERIAN IN SUPPORT OF EMERGENCY MOTION TO VACATE ORDER GRANTING COMPEL MOTION

1. I am over the age of twenty-one and I have personal knowledge of the facts contained herein.

2. On November 28, 2006, I received a telephone call from Amanda Matthews of GrayRobinson, P.A., who was calling for my wife, Terri Steffen, seeking to schedule a building inspection of the property for Thursday, November 30, 2006. **At no time did Ms. Matthews mention that she also wanted a buyer to tour the property. At no time did Ms. Matthews say that it was critical that the inspection occur on Thursday, November 30, 2006.** In fact, Ms. Matthews did not indicate any urgency whatsoever. I told Ms. Matthews that I did not have any conflict with Thursday and that Terri would get back to her as soon as she returned. When my wife returned, I gave her the message and watched her immediately return the call. An hour or so later, I saw my wife and asked her if she had scheduled the inspectors for Thursday so I could put it on my calendar. She said she had a conflict on Thursday and was trying to schedule it for Monday or Tuesday of next week.

3. On November 30, 2006, David E. Hammer ("Hammer") arrived at the residence located at 16229 Villarreal de Avila, Tampa, Florida, ("Residence") at approximately 8:25 AM. Mr. Hammer informed me that he was present for the purpose of insuring that building inspectors were granted



access to the Residence and gave me a brief explanation of what had transpired on November 28, 2006.

4. At approximately 8:50 AM, I noticed that there was a vehicle outside the gate of the Residence with its lights on. No one had called from the call box to have the gate opened so I suggested to David that he should check to see if it was the inspectors. I then left and went upstairs to the computer room and went back to work.

5. Approximately fifteen minutes later, Hammer paged me to the foyer of the Residence. When I arrived, I was shocked to see more than a dozen people gathered in the foyer, including six United States Marshals.

6. I asked why the Marshals were there and a female Marshal told me the Marshals were there pursuant to a court order. Again I was shocked and asked to see the court order. Someone handed me an order entitled Court's Order Directing United States Marshal's Service to Facilitate Entry into Premises (Doc. 153) ("Order"). I then asked the female Marshal what part of the Order contained the authority for the Marshals to be on the premises. She directed me to page 1, paragraph 1, which states, "[i]n the event the Debtor notifies the U.S. Marshal that the Debtor's representative and any potential purchaser, and their designated agents, are denied access to the Property on November 30, 2006 at 9:00 a.m., for the purpose of conducting a 'walk through inspection,' the Court hereby directs the U.S. Marshal, together with any other assisting law enforcement agency, to immediately provide assistance to the Debtor and the individuals described in the Access Order [which is another order I had never seen and was not aware of] to gain access to the Property to include the use of force deemed necessary to gain access to the Property." After I read this mind-boggling order, I asked the Marshals if the Debtor had notified the U.S. Marshal that anyone was



denied access to the Property. The U.S. Marshals refused to answer. I persisted for ten or fifteen minutes asking the Marshals in every way I could think of if the Debtor had notified the U.S. Marshal that anyone was denied access to the Property. The Marshals steadfastly refused to answer my question. I then asked for them to explain to me the basis for their authority under the Order if the Debtor did not notify them that it had been denied access to the property. The Marshals refused to explain other than to say they were on the premises pursuant to the court order. I then told the inspectors to begin their inspection and make themselves at home. The Marshals then instructed the inspectors not to leave the foyer.

7. I then stated that if the Marshals were refusing to answer my question that perhaps they would answer it for Judge Williamson, the person who had signed the Order. I asked Mr. Hammer to telephone the Judge's chambers and ask for his assistance. Unfortunately, Judge Williamson was in a hearing in Fort Myers, Florida, where he was not readily accessible. I then suggested the Marshals contact those Marshals present at the Fort Myers, Florida courthouse, to try to obtain Judge Williamson's attention.

8. Approximately fifteen minutes later, one of the Marshals called the other marshals outside to confer. Then, all the Marshals began walking rapidly to their cars to exit. I asked the Marshals why they were leaving. The Marshals refused to answer.

9. I remained at the Residence the entire day. At no time between on November 30, 2006 did Joseph Nolan or any representative of the Stalking Horse arrive on the property. At approximately 5:00 PM, my wife escorted Larry Mobley, an alleged bidder, and Stephanie Biernacki on a tour of the Residence.

10. The inspectors did not complete their inspection on November 30, 2006, so I invited them

3

to return today, which they did. The inspectors have been given complete and total access to the premises and my entire family has cooperated and assisted them in every way.

I, Paul A. Bilzerian, declare under penalty of perjury that the foregoing is true and correct. Executed on this 1st day of December, 2006, in Tampa, Florida.


Paul A. Bilzerian

4